IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 23, 2008 Session

**STATE OF TENNESSEE v. RANDY BRAY**

**Direct Appeal from the Circuit Court for Grundy County**
**No. 4155    Thomas W. Graham, Judge**

**No. M2007-01301-CCA-R3-CD** - Filed March 10, 2008

A Grundy County jury convicted the Defendant, Randy Bray, of two counts of first-degree murder, and he was sentenced to two life sentences. On appeal, the Defendant alleges that: (1) the evidence is insufficient to sustain his convictions; and (2) the trial court erred when it instructed the jury on flight. After a thorough review of the applicable record and law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Paul D. Cross (on appeal), Monteagle, Tennessee, Robert Morgan and Francis W. Pryor (at trial), Jasper, Tennessee, for the Appellant, Randy Bray.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Benjamin A. Ball, Assistant Attorney General; J. Michael Taylor, District Attorney General; Steven H. Strain, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

The Defendant was indicted on charges of the first-degree premeditated murder of Elvis and Anthony Sells. At the Defendant's trial, the following evidence was presented: Steve Andy Sells, Jr., the victims' brother, testified that Anthony was twenty-nine and Elvis Sells[1] was twenty-six years

---

[1]Becuase so many of the parties involved in this case have the same last name, the Court will refer to them by their first name.

old when they were killed. Anthony had been married to Christy Nunley Sells for three or four years at the time of his death, and Elvis had previously been married to Heather Cox, with whom he had three children. The last time he saw his brothers alive was the day of this incident.

Christy Sells, Anthony Sells' wife, testified that she had known the Defendant for several years before this shooting, but she did not consider him a friend. Christy testified that Anthony was killed on June 20, 2005, after an encounter with the Defendant at city hall. On that day, she and Anthony went to Tracy City to return a movie, and, while driving around Tracy City, they saw the Defendant in a white car at a red light. The Defendant pulled behind them and honked his horn at them. Anthony and Christy turned left and went up a hill, where the Defendant sped beside them in his car. When another car came, the Defendant had to get behind their car again. Christy said she and Anthony drove to the Save-A-Lot parking lot, where they saw Elvis and told him that they had seen the Defendant. Anthony decided to involve the police and drove he and Christy to a pay phone at the Piggly Wiggly, where he called 911 and asked for police assistance.

Christy said that she and Anthony then went to meet Elvis at Mountain Properties Realty. When they arrived, Elvis was fighting with the Defendant. The Defendant left when he saw Christy and Anthony, but not before threatening he would be back to "get you and your brother." Christy testified that she, Anthony, Elvis, and two of Elvis's daughters all went to the police department located at city hall. They waited for the police in accordance with the dispatcher's instructions. Anthony left to call 911 again, and Christy stayed at the police department located inside city hall with Elvis and Elvis's two daughters. She waited inside city hall's glass doors with the two girls while Elvis stayed in his truck. Christy testified that, when she saw Anthony return, she heard gunshots, and she ran outside to find her husband lying face down. She saw the Defendant shoot Elvis with a "long gun." Christy said she ran back to the police department for help, and the police arrived around that time. When she went back outside, neither Anthony nor Elvis were breathing, and the Defendant was gone. On cross-examination, Christy agreed that Anthony carried a stick with him when they saw the Defendant at Mountain Properties Realty. She denied ever seeing Elvis with a metal pipe.

Travis Cockran testified that he grew up beside the Defendant, and he recognized Anthony and Elvis Sells. He said that, on June 20, 2005, he was driving past Mountain Realty in Tracy City when he saw the Defendant and Elvis fighting. Elvis had the Defendant in a "head lock," and Cockran pulled into the parking lot because there were screaming children watching the fight. When he pulled in, the two men quit fighting. Cockran testified that the Defendant looked "mad" and did not look intoxicated. While Cockran was still in the parking lot, Anthony Sells arrived as the Defendant was getting into his car to leave. Shortly thereafter, Anthony and Elvis left the parking lot. He later saw the Sells's vehicles at the police department. While he was still in town, he heard gunshots. He went to the police department, but he did not see the Defendant or the Defendant's car there. He did see the two little girls yelling and screaming, and he grabbed them and took them inside city hall. He stayed with them until family members came to take them home.

On cross-examination, Cockran described the Defendant as quiet, little, and mild mannered. Cockran knew the Defendant's parents had marital problems. Cockran said that Anthony was carrying a stick when he arrived at Mountain Realty. He estimated it was about forty minutes later when he heard the gunshots. On redirect examination, Cockran testified that he heard Anthony tell the Defendant at Mountain Realty that Anthony was going to go to the police department.

Ellen Campbell testified that she was at the Piggly Wiggly on June 20, 2005, with her husband, who was driving their car. She saw a red truck pull into the parking lot followed by a white car, and the driver of the white car was honking the horn. She said the white car was "flying" and pulled in right behind the red truck. The red truck left and went toward Campbell's Supply Store, and the white car followed the truck. Campbell said that the white car then "smashed" into the back of the red truck. The red truck turned right in the direction of city hall. Campbell testified that she heard approximately four gunshots shortly after she lost sight of the two cars. Campbell and her husband went to city hall and saw Christy Campbell, who was their daughter-in-law, crying. Campbell said that she never saw the white vehicle again that evening.

Dana P. Campbell testified she worked at Piggly Wiggly as a cashier in June of 2005, and she knew the Defendant and recognized the Sells brothers. Campbell testified that she saw Anthony and the Defendant both in their respective vehicles when she drove to work for her 1:00 p.m. shift. She said she saw Sells in the right hand lane and the Defendant in the left hand lane, and it looked like the Defendant was trying to catch up with Sells. At 6:00 p.m., she saw the two cars racing around the corner to her left while she was on her dinner break from work. While she was still on a break, she saw the two cars again, and they appeared to be headed towards Campbell's Supply Store. Anthony's car led, with the Defendant following closely behind. She said that Anthony stopped, and the Defendant's car bumped into the bumper of Anthony's car. The two cars then went toward the police station. Campbell testified that she never heard gunshots, but it had been storming so she may have thought the shots were thunder.

Wanda McDaniel testified that she works for the 911 Center in Grundy County, and her records indicated that Anthony Sells called the center at 5:42 p.m. on June 20, 2005, from the pay phone in the Piggly Wiggly parking lot. McDaniel testified that Sells reported the Defendant was drunk and trying to assault him, and he requested police assistance. She said there was no Tracy City Police Unit on duty at the time, but she told him to stay near the police department because an officer came on duty at 6:00 p.m. Officer Bess, who was supposed to come on duty at 6:00 p.m., was busy responding to a situation at a housing department. At 6:21 p.m. the dispatcher received multiple calls about a shooting.

Ron Bess, a deputy sheriff with the Grundy County Sheriff's Department, testified that on June 20, 2005, his department was short-handed. His normal hours were from 6:00 p.m. until 2:00 a.m. On that day, he responded to a call at Grundy Housing Authority, which delayed his arrival to the Tracy City Police Department. Dispatch advised him that he was to meet someone at the police department about an alleged assault, and, when he got to the station, he parked in the back. He never heard any gunshots, but he soon heard a woman screaming into the front door. He exited the

building in the direction the woman was pointing, and he saw a body lying on the ground and another body by the red truck. Officer Bess called for assistance. Tennessee Bureau of Investigations ("TBI") Agent Davis came to assist him, and Officer Bess turned the scene over to him when he arrived. Later that evening, the officer went to the bridge, where witnesses placed the collision between the Defendant's car and Anthony Sells's car, and collected some pieces of debris that appeared to have come off the car during the collision. He gave these to Agent Davis.

Tim Garner, a trooper with the Tennessee Highway Patrol, testified that he assisted in this investigation and found the white Buick that witnesses reported was connected with this shooting. The car was registered to Heather Sells and had damage to its front end. There was red paint near the damaged area, indicating that the car collided with something red. Trooper Garner returned to the car the next afternoon with Agent Davis. When the two arrived, they encountered the Defendant walking from the gate near the car to the road. Trooper Garner described the Defendant as cooperative, and the Defendant told the trooper that he was the man for whom the trooper was looking. On cross-examination, Trooper Garner agreed that the Defendant acted politely when he encountered him and that he was "[s]oft spoken."

Larry Davis, a special agent with the TBI, testified that he was asked by dispatch at 6:43 p.m. on the day of this shooting to assist in this investigation. When he arrived at the crime scene, he noticed it had been taped off and there were several officers standing outside of the tape. He videotaped and photographed the crime scene. The agent described many of the photographs of the crime scene, and he noted that Anthony Sells drove a red S-10 pickup truck. He found a wooden stick portruding from the right rear wheel of the truck. At the scene, closer to the body of Elvis Sells, the agent also found a steel pipe that was approximately two feet long with threads at one end. The agent also retrieved multiple Remington Express 12 gauge shotgun shells, and six "waddings" or casings from those shells. Agent Davis examined Anthony Sells's body and found he suffered gunshot wounds to center of the small of his back, his right shoulder blade, and the top of his head. Anthony Sells also had an unopened box cutter attached to the outside of his pants' pocket.

Agent Davis learned that the Defendant may have been involved in this shooting and that the Defendant was driving a white Buick. The Defendant's car was later located and towed to the fire hall for Agent Davis to examine. Agent Davis saw the car had been in an accident involving its front-end, and, after learning that the car may have rear-ended Anthony Sells's car, he directed Officer Bess to go and gather evidence from the location of that collision. Agent Davis attempted to locate the Defendant, and, as part of his investigation, he went back to where the Defendant's car had been located. There, they found the Defendant standing in the road. Agent Davis advised the Defendant of his rights, the Defendant indicated that he understood, and the agent asked the Defendant for the gun. The Defendant took him through the gate and to a wooded area where the gun was propped against a tree covered by the Defendant's T-shirt.

Agent Davis testified that, when he discovered the Defendant, the Defendant was not wearing a shirt. He noticed that the Defendant had several scratches and a hand injury. The Defendant said that he was scratched from falling while running through the woods. Additionally, the Defendant

told him he had injured his knee. Agent Davis videotaped the Defendant, in which the Defendant explained his injuries and did not appear to be intoxicated. The Defendant was then taken to the jail where he was interviewed.

Agent Davis said that the distance between the bodies of the two victims was fifty-nine feet. The agent also went to where the Defendant said he obtained the gun, the Clouse Hill residence, and there he found the shotgun cover.

On cross-examination, Agent Davis described the Defendant as "cooperative" when surrendering himself and showing the agent where the gun was located. The agent also agreed that the Defendant gave him a voluntary statement and was polite and courteous. The agent agreed that he saw the Defendant approximately twenty-four hours after the shooting, and he did not know the Defendant's mental state at the time of the shooting.

Dr. O'Brian Cleary Smith testified that he performed the autopsies in this case. He said that Anthony Sells, who was 6'1" tall and 226 pounds, sustained multiple gunshot wounds to his head and torso, most of which entered his body from his back and traveled through the body towards his front. Anthony Sells died as a result of these gunshot wounds. Dr. Smith testified that Elvis Sells, who was 6'1/2" tall and 146 pounds, suffered multiple blows of blunt trauma to his head in addition to multiple gunshot wounds. The gunshot wounds appeared to enter Elvis Sells's left side and left upper chest. The blunt trauma injuries fractured Sells's skull in multiple places, which caused bleeding in his brain and swelling. These injuries alone could have been fatal. The doctor opined that the blunt trauma injuries to Elvis Sells's head could have been caused by a pipe similar to the one found at this crime scene. Dr. Smith listed the cause of Elvis Sells death as a "result of multiple injuries." On cross-examination, Dr. Smith testified that there is a possibility that Elvis Sells could have survived the head trauma.

Don Carmen, an agent with the TBI crime laboratory, testified how the shotgun involved in this case must be pumped every time it is shot to expel the previously fired shell casing. The shotgun held seven shot shells, but it could hold eight total if you chambered the first shell and loaded another. Agent Carmen testified that the shells contained nine "double ought" buck pellets, which is comparable to a .33 or .34 caliber type of bullet. These shells are considered "high-powered." The agent determined that the shells found at the crime scene were fired from the gun retrieved from the Defendant when he surrendered. Agent Carmen also examined the victims' clothing to determine the distance from which they were shot. He determined that Anthony Sells was shot from less than ten feet. Elvis Sells was shot at a distance from between five and forty feet, and the agent could not be more specific because there was not a clear pattern in the clothing.

Linda Littlejohn, a forensic scientist for the TBI, testified she examined pieces of a car grill found by police in a roadway. She compared those pieces to the Defendant's car and determined that they came from the Defendant's car.

Margaret Bash, an agent with the TBI crime laboratory, testified she examined the floor mats

from the Defendant's car but found no blood on them. She also did not find blood on the Defendant's T-shirt. She did, however, find blood on the steel pipe found at the crime scene but could not obtain a DNA profile from the blood on the pipe. Agent Bash tested the stick found at the crime scene and found the presence of blood on the stick but was unable to match the blood to anyone in particular. She did not receive for comparison blood samples from either victim.

Hoyte Phillips, a special agent with the TBI crime laboratory, testified that he was unable to obtain any identifiable fingerprints from the stick or steel pipe involved in this case.

Sammy Reed testified that he had been friends with the Defendant for a long time, and he saw the Defendant the day of this shooting when the Defendant came to his house. Reed said he knew that the Defendant had taken a Xanax that day, and he had seen the Defendant take that drug on a few previous occasions. When the Defendant had taken Xanax he was more talkative, and the drug appeared to relax him. Reed said that, when the Defendant came to his house that day, he was wet. When he asked the Defendant why he was wet, the Defendant said that he had been standing in the rain. The Defendant appeared "red faced" and "glazed."

Ronald Bray, the Defendant's father, testified that he was married to the Defendant's mother a long time ago, and he agreed their marriage was "rocky." After their divorce, the Defendant's mother initially had custody of the Defendant, but, after a couple of years, Bray obtained custody and moved with the Defendant to Ohio. He met a woman in Ohio, but she did not like the Defendant. She left the Defendant outside in the freezing cold one day after the Defendant came home from school. After this incident, Bray left that woman and moved back to Tennessee. Bray testified that he had custody of the Defendant for four and a half years, and the Defendant missed his mother a lot.

Bray testified that, the day of this shooting, he gave the Defendant two Xanax pills around 2:00 p.m. and told him to go to sleep. Bray said he had given the Defendant Xanax pills before, and the pills usually made the Defendant sleepy. Bray did not see the Defendant consume any beer that day, but the Defendant took two beers in the refrigerator with him. Bray said that the Defendant had been in jail for not paying child support, which worried the Defendant. Bray testified that the Defendant had previously had three girlfriends, and they all eventually left him.

The Defendant, a thirty-two year old Grundy County native, testified that he was nine or ten years old when his parents divorced. At first, he lived with his mother in Kingston, and then he lived with his father, who moved a lot. He also lived with his grandmother in Tracy City for some period of time. The Defendant recalled that, when he was twelve or thirteen and lived with his father, his father moved to Troy, Ohio with the Defendant and the Defendant's sister. The Defendant's father remarried, and the Defendant did not get along with his stepmother, who would tell him that she hated him, smack him, throw things at him, and shove him. The Defendant's stepmother even locked him out of the house in the snow. After about a year and a half, the Defendant's father divorced his stepmother, and the family moved back to Tennessee. The Defendant testified about how he moved house to house after his return to Tennessee, sometimes living with his mother,

father, grandmother, or aunt. The Defendant enrolled in school upon his return, but the last grade he completed was the eighth grade. He later received his GED.

The Defendant testified about his past girlfriends, saying that he was approximately twenty-five when he had his first serious relationship. When that relationship ended, he met and moved in with another girl, Allison Johnson, and Johnson became pregnant. When the Defendant learned that Johnson was pregnant with his child, the two discussed marriage, but Johnson said that she did not want to get married. She moved out two weeks after he learned she was pregnant, saying that she wanted to be closer to her mother. The Defendant attempted to see his child, but Johnson refused to allow it. The Defendant sued for visitation rights, and he won visitation and also became obligated to pay child support. The Defendant recalled that, during his relationship with Johnson, Johnson's ex-boyfriend came to their home, kicked in the door, shot the Defendant's truck, and held a gun to the Defendant's head.

The Defendant's next relationship was with Teresa Bell, and they had twin boys together. The Defendant said he also had child support obligations with respect to these two boys. The Defendant recalled that he asked Bell to marry him at least three times, but she refused each time. The Defendant recalled a different occasion when he was dancing with a woman and a man came up to him, stuck a knife into his stomach, and told him that he was going to "cut [his] guts out."

The Defendant described his work history and life's goals, saying he had been laid off from his most recent job at Batesville Casket Company. The Defendant, who worked for the casket company as a temporary employee, had hoped to be offered a permanent position before he was laid off. About his life's goals, the Defendant said that he wanted a "regular" life, which he described as being married with children, a home, and a nice job.

The Defendant testified about his relationship with Heather Cox, who had been married to Elvis Sells. He said that the two met at an Amoco gas station in Tracy City, where Cox worked, when he stopped there with Sam Reed. Reed knew Cox and introduced Cox to the Defendant. Cox was, at that time, still married to Elvis Sells. When Cox and Sells separated, the Defendant and Cox began dating. Eventually, the two moved into a trailer together. The Defendant, who had been laid off from the casket company, was looking for a job, and the two suffered serious financial difficulties.

The Defendant said he got along with Cox's three children, and he and Cox began to discuss marriage about three months before the shooting in this case. About two or three weeks before this shooting, the two decided to get married the first week of July, in part, because Elvis Sells would have the children that week. The Defendant said that he and Elvis Sells had gotten along up until this point.

The Defendant testified about the events of June 20, 2005, saying that Cox had worked the night before. The two had attempted to borrow $800 to go to Gatlinburg, get married, and stay for a day or two. They were unsuccessful, returned home, and the Defendant called about a job in

Tullahoma. The Defendant was told there were no jobs available and was asked to call back. The Defendant reiterated how much financial stress he and Cox were under. He then said Cox told him that they could delay the wedding. The Defendant said he felt "sort of let . . . down again . . . [he] could understand in a way, but it was like this is happening all over again." Cox then said that she was tired, and she went to lie down while the Defendant "rambled around the house . . . ." The Defendant then took two Xanaxes because he was "aggravated."

The Defendant said he then went to the post office in town, to the telepone office, and to his father's house. While at his father's house, the Defendant ingested two more Xanax pills and took a couple of beers with him. The Defendant then went to Reed's house, but Reed's truck was not there and he assumed Reed was gone. At this point, the Defendant had consumed four Xanax pills. He left Reed's house and went to town to look for Reed. He said that he did not see Reed, but he realized that he was driving behind Elvis Sells's car, and Cox's two girls were in the back of the car waving to him. The Defendant said it appeared Sells told the girls to sit down, and then, when he spotted the Defendant, he "flip[ped] [him] off." Sells pulled into the Save-A-Lot parking lot, and the Defendant heard him say something, which the Defendant could not discern, as the Defendant drove by.

The Defendant turned around and confronted Elvis Sells, asking him what his problem was. Sells said that the Defendant was his problem. The Defendant said that another man then approached to say hello, and after he walked away Sells accused the Defendant of drinking. The Defendant admitted that he had been drinking, but he had only had one beer at that point. The Defendant said he left the Save-A-Lot parking lot first, and he saw Anthony Sells, who also flipped him "a bird." The Defendant said that he turned and went back to Reed's house. Reed's mother let the Defendant in, and the Defendant had two more beers and two more Xanax pills before Reed arrived forty five minutes later. The Defendant left to go back to his father's house. On the way, he saw Elvis Sells again, and Elvis Sells indicated for him to pull over. The two of them went to the Mountain Top Realty parking lot. When the two got out of their cars, Elvis Sells "jumped" on the Defendant, and the two engaged in a fight. Anthony Sells then arrived with a wooden stick and started running towards the Defendant with the stick raised. Another man, Kevin Sanders, arrived and broke up the fight.

The Defendant said that he left and went back home. He said that he was mad because the two brothers had started this with him and had jumped on him. He was going to tell Cox what had happened and ask her if she had told them that they were planning to marry because it "seemed like they were riled up for some reason." He awoke Cox, told her what had happened, and she told him not to go back into town. The Defendant said that he then called the Sells's mother and told her that she needed to get hold of her sons before someone got hurt. The Defendant retrieved a loaded shotgun he received for his birthday from the house and then left for his father's house. On the way, he saw Anthony Sells, who yelled "F-you" to him and motioned for the Defendant to "come on." The Defendant followed Sells, Sells then hit his breaks, and the Defendant collided with the back of his truck.

The Defendant said Anthony Sells laughed at him and motioned for him to "come on." The Defendant followed Sells toward city hall, and he said that he was "really mad." The Defendant testified that his neck and face were burning badly as he was making the turn toward the police station. When they arrived, Elvis Sells was already there. Anthony Sells pulled in and stopped. The Defendant pulled in behind him. Anthony Sells jumped out, got his bat, and the Defendant noticed that Elvis Sells had a pipe. The Defendant said he got out the shotgun. The Defendant said that "by the time I fired . . . the first shot, I had lost, I couldn't hear and I couldn't – my vision was just getting black. I was looking out like a hole smaller, smaller than a plate." The Defendant said that he shot Anthony and Elvis Sells because he was scared. The Defendant did not remember picking up the pipe, but he remembered standing beside Elvis Sells with the pipe in his hand. He said that he did not remember the shooting, and he only awoke from his trance when he heard a scream. He said that "[i]t's like everything c[a]me back." He found himself at that moment "hunkered down over Elvis with the pipe in my right hand and I had the shotgun in my left hand." He said that he held onto the shotgun and threw the pipe.

The Defendant said that he left because he did not know what else to do. He went to the woods and spent the night rambling around in the woods. He decided that he would get in touch with his father the next day because his father would have sound advice for him. The next day, he encountered Agent Davis and a few state troopers. The Defendant said that he would not have done this if he had it to do over again.

On cross-examination, the Defendant testified that he did not recall what he had done the weekend before this shooting, which was on a Monday. He said he did not have a car of his own, but Cox had two cars. The Defendant said that he did not have a job for any of the time that he lived with Cox, and he agreed that the two were living on what Cox made and what they received in child support from Elvis Sells.

The Defendant agreed that, after Elvis Sells "flipped" him "the bird," he followed Sells into the Save-A-Lot store, where Sells was shopping with his children. The Defendant said that he followed Sells into the store because he wanted to "get what I had to say out." He doubted if Sells appreciated what he had to say. The Defendant said that he did not recall whether he raised his voice while speaking with Sells in the store, but reiterated that a man whom he knew came up to him and patted him on the back and asked if he was okay. The Defendant said that he did not remember the encounter that Christy Sells described wherein the Defendant saw Christy and Anthony Sells at a gas station and followed them sometimes driving on the wrong side of the road. He emphasized that he was not testifying that this incident never happened but was saying that he did not remember this incident.

The Defendant agreed that Elvis got the better of him when the two fought in the Realty parking lot. After Elvis Sells got the Defendant into a headlock, the fight was broken up by Sanders. Anthony Sells then arrived and approached him with the stick, and Sanders told Anthony "no, no, no." Anthony never hit the Defendant with the stick. The Defendant said that Anthony was yelling at him, and the Defendant may have said "F-you" back to Anthony. The Defendant agreed that he

went back to his trailer after this and got his shotgun, leaving the case on the floor. He agreed that he knew the shotgun was loaded with "double ought" buckshot and that he lied to Agent Davis when he said otherwise.

The Defendant reiterated that, when he saw Anthony Sells at the Piggly Wiggly shortly before the shooting, Anthony Sells motioned for him to follow him and then slammed on his breaks. He said he thought that Anthony may have wanted him to run into Anthony's truck. When they arrived at city hall, Anthony got out of his truck with the stick. The Defendant said that Anthony turned to run after the Defendant got his shotgun out of the car. The shotgun did not have a shell in the chamber, so the Defendant had to "rack[]" one into the chamber. He agreed that he shot Anthony in the back once. Then, he shot Elvis with the next shot. The Defendant agreed that Anthony would have then been on the ground when he shot him two more times. The Defendant said that he did not remember shooting any more after that. He agreed that he likely shot his gun seven times. The Defendant said that he "thought" that he hit Elvis Sells in the head with a steel pipe, but he did not remember clearly.

The Defendant testified that he told Agent Davis that he was not intoxicated at the time of this shooting, having only consumed three beers. Further, he never mentioned to Agent Davis that he had taken any Xanax pills, but he explained that the agent did not ask him if he had consumed any pills. The Defendant said that Xanax usually made him go to sleep, but he did not go to sleep this day.

Dr. David Solovey, a clinical psychologist, testified that he interviewed the Defendant, the Defendant's mother, fiancé, and father. The doctor testified that the Defendant's history was relevant to these events, and he described how the Defendant was physically abused by his father, abandoned by his mother, and physically abused by his stepmother. Dr. Solovey explained how there had been little structure in the Defendant's life, causing the Defendant to have poorly developed self-management skills. The doctor said that, in addition to the Defendant being abused by his family, he was also abused in school. This combined abuse made the Defendant have a "highly dependent personality, always looking to others to take care of him, but always expecting and getting frustration at being taken care of." The doctor described some instances of physical and psychological abuse that the Defendant suffered. Dr. Solovey diagnosed the Defendant as suffering from long term Post-Traumatic Stress Disorder and depression. The doctor opined that the Defendant did not suffer from a mental disease or defect that made him unable to appreciate the wrongfulness of his actions. The doctor explained that when Xanax is taken at higher doses it can cause the user not to remember certain events.

Dr. Solovey explained that "paradoxical" reactions to medications refers to when a person has an "extreme, unexpected" reaction to a medication. He said that this, in addition to "years of submerged anger" and the "threat and . . . possibility of being killed or attacked," could have influenced the Defendant's actions that day by lowering his inhibitions.

On cross-examination, the doctor testified he had not reviewed any of the TBI reports from

this incident, and he was unaware the Defendant shot one of the victims twice in the back as the victim was fleeing. The doctor reiterated that he had indicated that the Defendant, who had not been prescribed Xanax, had taken six 1 milligram pills of Xanax. He agreed that Xanax comes in different sizes, varying between a quarter of a milligram to two milligrams. Further, he said he based his opinions on what the Defendant had told him and not a toxicology report. Dr. Solovey testified that the combination of Xanax and beer would have reduced the Defendant's inhibitions and allowed his fear and paranoia to surface. The doctor agreed that the Defendant pursued the object of his fear by chasing Anthony Sells in his car.

Dr. Mark Peterson, a psychiatrist, testified that Xanax is a prescription medication used for treatment of panic disorder and to help quiet or sedate anxiety. Dr. Peterson testified that a person can have a paradoxical reaction to Xanax, which he described as "paradoxical excitement." The doctor said he did not examine the Defendant but had spoken with the Defendant's attorney and read Dr. Solovey's report. Dr. Peterson testified that he had previously prescribed a patient a medication to calm the patient and the medication had the opposite, or unexpected, effect. The doctor said that a patient who suffers this reaction, especially when the medication is combined with another sedative such as alcohol, is a "very disrupted state of insight." The doctor said, "They do not understand what's happening. Their judgment is usually very very bizarrely affected and they're often doing things that they normally would not do." The doctor said that a "paranoid reaction" is often a part of the paradoxical effect. A paranoid reaction is an abnormal fear "to the point where the person who has it thinks that other people are reading their minds or carrying concealed weapons or doing things to a person that are, obviously, not true from an outsider's point of view, but from the patient's point of view they think it's actually happening." The doctor said that both Xanax and alcohol leave the body quickly, so, within 24 hours their effect would have been beginning to clear up or have cleared up entirely.

On cross-examination, Dr. Peterson testified that Xanax is an addictive drug and the withdrawal symptoms are physically painful. Dr. Peterson testified that too much Xanax in a person's system can cause the person to be "quite sleepy" and "stumble[e] around as if drunk" and would also affect their ability to drive an automobile.

Based upon this evidence, the jury convicted the Defendant of two counts of first-degree murder. The Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; and (2) the trial court erred when it instructed the jury on flight.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence against him is insufficient to sustain his convictions for three reasons. First, he contends that the evidence was insufficient to support his

convictions because there was no proof to refute that he was intoxicated at the time of the shootings. The Defendant notes that the trial court instructed the jury on voluntary and involuntary intoxication. He asserts that he established at trial that he was unaware of the "explosive" side effect of Xanax and that he suffered from a paradoxical reaction to Xanax, as described by medical experts. Further, he asserts that he should have been found to be involuntarily intoxicated because his proof went "virtually . . . unchallenged." Second, the Defendant contends that even if proof of involuntary intoxication is disregarded, he still should have only been convicted of voluntary manslaughter because the evidence that he was in fear of the victims was substantial and there was substantial evidence of provocation, showing that he acted in a state of passion. Finally, he asserts there was insufficient proof of premeditation to support his first degree murder convictions.

The State counters that the Defendant introduced evidence that it was possible for someone to have a paradoxical reaction to Xanax, but there was no testimony that the Defendant suffered this type of reaction. Further, the State notes that there was testimony the Defendant had previously taken Xanax and that it calmed him. The State asserts that the jury rejected the Defendant's contention of involuntary intoxication and that there is ample support for its finding that the Defendant acted with premeditation.

When an accused challenges the sufficiency of the evidence this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.w.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). In such cases, however, the facts must be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*,

493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000). Importantly, the credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. *Bland*, 958 S.W.2d at 659.

### 1. Involuntary Intoxication

The Defendant first contends that he presented uncontradicted proof that he was involuntarily intoxicated by a combination of Xanax and alcohol. He asserts his intoxication was involuntary because he had a "paradoxical" reaction to the Xanax, which he never before experienced. The State counters that, while the Defendant offered proof that it was possible for someone to suffer a paradoxical reaction to Xanax, there was no evidence that the Defendant had that reaction to this drug at the time of the shootings.

The legislature distinguished between voluntary and involuntary intoxication. Neither diminished capacity nor voluntary intoxication are true defenses. *See* T.C.A. § 39-11-503(a) (2003). "[I]ntoxication itself is not a defense to prosecution for an offense. However, intoxication, whether voluntary or involuntary, is admissible in evidence if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a). Moreover, "[i]f recklessness establishes an element of an offense and the person is unaware of a risk because of voluntary intoxication, the person's unawareness is immaterial in a prosecution for that offense." T.C.A. § 39-11-503(b). The legislature also chose to address the interplay between intoxication and insanity:

> Intoxication itself does not constitute a mental disease or defect within the meaning of § 39-11-501. However, involuntary intoxication is a defense to prosecution if, as a result of the involuntary intoxication, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law allegedly violated.

T.C.A. § 39-11-503(c).

The Defendant contends that, because he was unaware of the paradoxical affect that Xanax could have, he was involuntarily intoxicated. While involuntary intoxication has been defined in our current law as "intoxication that is not voluntary," voluntary intoxication requires that a substance has been "knowingly introduced into the person's body." T.C.A. §§ 39-11-503(d)(2), (3). This suggests that involuntary intoxication requires that the ingestion of a substance is not "knowing," but rather attributable to a "mistake, trick, accident, or coercion." *Layne v. State*, 531 S.W.2d 802, 803 (Tenn. Crim. App. 1975). Therefore, we cannot conclude the Defendant's voluntary taking of a medication, to which he alleges he had an adverse reaction, constitutes involuntary intoxication. The Defendant is not entitled to relief on this issue.

## 2. Adequate Provocation

The Defendant next contends that a state of passion by adequate provocation sufficient to lead a reasonable person to act in an irrational manner was present in this case, and he should have, therefore, been convicted of voluntary manslaughter. *See* T.C.A. § 39-13-211 (2005). Before deliberating, the jury received appropriate instructions on the elements required to prove first degree murder, second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide, including the requisite *mens rea* for each offense. By finding the Defendant guilty of first degree murder, the jury obviously rejected the Defendant's claim that the shooting occurred in a state of passion produced by adequate provocation. This was within its province. *See State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). Moreover, a rational jury could have concluded from the testimony that the Defendant did not kill in a state of passion. The Defendant is not entitled to relief on this issue.

## 3. Premeditation

First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1) (2003). "Premeditation" is defined as "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2003). This is a question of fact for the jury to determine, and it can be inferred from a number of circumstances, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Furthermore, "evidence of repeated blows is relevant to establish premeditation, although this evidence alone is not sufficient to establish premeditation." *State v. Sims*, 45 S.W.3d 1, 8 (Tenn. 2001).

The evidence in this case, viewed in the light most favorable to the State, proves that the Defendant saw Elvis Sells driving on June 20, 2005. He followed him into the Save-A-Lot, where he engaged him in a verbal confrontation. The two met again at a realty parking lot, where they engaged in a physical confrontation, during which Elvis Sells maintained the upperhand until the

fight was stopped. Anthony Sells subsequently called 911 asking for assistance with the Defendant. The Defendant went home, got a shotgun, called the victims' mother, and left to find the victims. He saw Anthony Sells driving, and followed him, ramming the back of his truck on one occassion. He followed Anthony Sells to City Hall, where Anthony Sells got out of his truck with a stick in his hand. The Defendant exited his car with the shotgun, and Anthony Sells turned away from the Defendant. The Defendant shot Anthony Sells multiple times in the back. He then shot Elvis Sells, who was sitting in his own vehicle, multiple times. He then beat Elvis Sells in the head with a lead pipe. We conclude that these facts are clearly sufficient to support convictions for premeditated first degree murder

## B. Flight Instruction

The Defendant next contends that the trial court erred when it instructed the jury on flight. He argues that, because he admitted to shooting the victims before the jury was instructed, the only issue before them was the degree of homicide and not his identity. The State submits that the Defendant waived any challenge to the jury instructions by failing to make a contemporaneous objection. *See* Tenn. R. App. P. 36(a). In the alternative, the State asserts that the instruction was proper.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *accord State v. Forbes*, 793 S.W.2d 236, 249 (Tenn. 1990); *see also* Tenn. R.Crim. P. 30. "In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence to support such an instruction requires "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community.'" *State v. Burns*, 979 S.W.2d 276, 289-90 (Tenn.1998) (quoting *State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)). Our Supreme Court has held that "[a] flight instruction is not prohibited when there are multiple motives for flight" and that "[a] defendant's specific intent for fleeing a scene is a jury question." *Berry*, 141 S.W.3d at 588.

Addressing this issue on its merits, we conclude that there was sufficient evidence to warrant a flight instruction. The Defendant shot both of the victims, and then he left the scene of the shooting in his car. He drove his car to a remote location and hid in the woods until the following day. He left the woods, where he was seen and arrested by law enforcement. In our view, the evidence at trial established both a "leaving the scene" and a "hiding out" sufficient to warrant an instruction on flight. In consequence, the trial court did not err by providing the instruction.

## III. Conclusion

Based upon the foregoing reasoning and authorities, we affirm the Defendant's convictions.

_____
ROBERT W. WEDEMEYER, JUDGE

-15-